SEAFARERS
INTERNATIONAL UNION

v.

NATIONAL MARINE
SERVICES, INC., et al.

Civ. A. No. 85–4618.

United States District Court,
E.D. Louisiana.

July 18, 1986.

Louis L. Robein, Jr., Metairie, La., for plaintiff.

D. Michael Linihan, St. Louis, Mo., Terrence C. Forstall, New Orleans, La., for National Marine.

Harry A. Rosenberg, New Orleans, La., for Compass Marine.

### OPINION

SEAR, District Judge.

This is an action to enforce a collective bargaining agreement.

The plaintiff, the Seafarers International Union of North America, Atlantic, Gulf Lakes, and Island Waters ("the SIU" or "the union"), is an unincorporated labor organization representing employees of defendant National Marine Services, Inc. ("National Marine" or "the employer").

The defendants, National Marine and Compass Marine Propulsion, Inc. ("Compass"), are employers in an industry affecting commerce within the meaning of 29 U.S.C. §§ 142, 185.

Jurisdiction is exercised pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a).[1]

### I. FACTS

The dispute which is the subject of this action was precipitated by recent financial difficulties experienced by National Marine. National Marine is engaged in the barge transport business, primarily the transport of liquid petroleum products. It operates a large fleet of barges and formally operated about 18 tugs in connection with the barges.

In 1985, National Marine decided to sell its tugs in order to streamline its operations and raise cash. It contracted with Compass to sell 14 tugs effective October 9, 1985 for $5,275,000. At the same time National Marine and Compass also entered into a towage contract whereby Compass agreed to dedicate the tugs to move National Marine's barges. In conjunction with the sale, National Marine laid off its employees working on the tugs effective October 9th.

On October 9, 1985, Compass employees assumed operation of the tugs and have operated them since. The status of the sale, however, is unclear. The purchase price has not yet been paid and it is still unclear who has title to the tugs.

The SIU represents the National Marine employees who were laid off because of the sale. On September 27, 1985, pursuant to a collective bargaining agreement between the parties (also called "the agreement"),[2] the SIU filed grievances challenging the

---

**1.** 29 U.S.C. § 185(a) provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect

to the amount in controversy or without regard to the citizenship of the parties.

**2.** Actually, there were 2 collective bargaining agreements, one covering about 90 unlicensed employees, primarily tankermen, ("Unlicensed Agreement") and the other covering about 40 licensed employees, captains, mates, pilots and engineers ("Licensed Agreement"). The provisions of the 2 agreements material to this action

sale of the tugs and the layoff of its members. Its grounds were that the sale of the tugs was a sham and the sale and towage agreement constituted a subcontracting of bargaining unit work in violation of the collective bargaining agreement and that the layoff of its members was a violation of the recognition clause of the collective bargaining agreement. On October 4, 1985, the SIU demanded arbitration of its September 27th grievances pursuant to the binding arbitration provisions of the collective bargaining agreement. National Marine refused to submit to arbitration because, among other reasons, the collective bargaining agreement, by its terms, was effective only from October 9, 1982 through October 8, 1985, and therefore the sale and the layoffs would not occur until after its expiration.

On October 7, 1985, the SIU brought this action for temporary restraining order, preliminary injunction and permanent injunction seeking: (1) an order compelling National Marine to submit the September 27th grievances to binding arbitration as set forth in the collective bargaining agreement; and (2) an injunction prohibiting National Marine and Compass from effecting the sale of the tugs and prohibiting National Marine from laying off bargaining unit employees pending arbitration of the September 27th grievances.

On October 8, 1985, a hearing was held on the SIU's request for temporary restraining order and the request was denied because it was not justified on a balancing of the equities.

The matter is now before the Court following a hearing on the SIU's request for preliminary injunction.

## II. REQUIREMENTS OF A LABOR INJUNCTION IN SUPPORT OF ARBITRATION

The jurisdiction of the federal courts to grant injunctive relief in cases arising out of labor disputes is sharply limited by the Norris-LaGuardia Act, 29 U.S.C. §§ 101–115.

■ The district courts, however, do have jurisdiction under section 301 of the Labor Management Relations Act of 1947 over suits for violation of a collective bargaining agreement. 29 U.S.C. § 185(a). The district courts' jurisdiction under section 301 includes jurisdiction to grant injunctive relief in support of a mandatory arbitration clause. *Boys Markets, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Cf., Textile Workers Union v. Lincoln Mills of Ala.*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The district courts may grant injunctive relief against either an employer or a union in order to maintain the status quo relationship between the parties pending the results of arbitration under their collective bargaining agreement. *See e.g., Gulf Coast Indus. Workers' Union v. Exxon*, 712 F.2d 161 (5th Cir.1983) (dictum); *Int'l Union v. Dana Corp.*, 679 F.2d 634 (6th Cir.1982); *Local Lodge 1266 Int'l Ass'n of Machinists v. Panoramic Corp.*, 668 F.2d 276 (7th Cir. 1981); *United Steelworkers v. Fort Pitt Steelcasting*, 598 F.2d 1273 (3rd Cir.1979); *Lever Brothers Co. v. Int'l Chemical Workers Local 217*, 554 F.2d 115 (4th Cir. 1976).

■ The requirements for granting status quo injunctive relief in support of arbitration are: (1) the underlying grievance is subject to mandatory binding arbitration under a collective bargaining agreement, i.e. arbitrability; (2) the party seeking the injunctive relief is ready and willing to submit the grievance to arbitration; and (3) injunctive relief is warranted under ordinary principles of equity.[3] *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 721, 102 S.Ct.

---

are for all intents and purposes the same. Consequently, the 2 agreements are treated as one.

**3.** Ordinarily preliminary injunctive relief is only appropriate where the party seeking relief establishes: (1) a substantial likelihood that it will prevail on the merits; (2) a substantial threat that irreparable injury will result to it if the preliminary injunction is not granted; (3) that the threatened injury to it outweighs any threatened harm to the other parties; and (4) that granting the preliminary injunction will not dis-

2672, 2684, 73 L.Ed.2d 327 (1982); *Buffalo Forge v. United Steelworkers*, 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976); *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974); *Boys Markets, supra*, 398 U.S. at 254, 90 S.Ct. at 1594.

## III. ARBITRABILITY

The threshold issue dispositive of the relief the union seeks is whether its September 27th grievances are arbitrable. If they are not, then the union is not entitled to either an order compelling arbitration or an injunction of the sale of the tugs in support of arbitration, and its complaint must be dismissed. The issue of arbitrability is a question of law which the court must decide. *AT & T Technologies, Inc. v. Communications Workers of America*, —— U.S. ——, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *Int'l Union of Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491, 92 S.Ct. 1710, 1712, 32 L.Ed.2d 248 (1972).

### A. The Union Grievances and the Collective Bargaining Agreement

The essence of the union's September 27th grievances is that National Marine effectively fired union members and replaced them with nonunion labor pursuant to a subcontracting agreement with Compass. The union argues that this conduct violated its contractual rights under the no subcontracting clause[4] and the recognition clause[5] of the collective bargaining agreement. The union further argues that whether National Marine's conduct violated its rights under the collective bargaining agreement must be submitted to arbitration in accordance with the mandatory arbitration clause of the agreement.

The arbitration clause requires that:

All complaints, disputes or grievances arising between the parties hereto relating to or in connection with or involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, shall be processed pursuant to this Article.[6]

The clause requires arbitration of: (1) all grievances related to the parties contractual rights under the term of the agreement; and (2) all grievances related to the relations between parties. If the union's grievances challenged conduct by National Marine which effected the parties' rights or

---

serve the public interest. *Mississippi Power & Light v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985).

Where the injunction is sought in support of arbitration the requirement that the party seeking relief establish a substantial likelihood of prevailing on the merits is often diluted. Generally, the party seeking relief need not show that it will prevail in arbitration. Rather it need only establish that the position it will espouse in arbitration is sufficiently sound to prevent arbitration from being a futile endeavor. This difference is required to prevent the courts from encroaching upon the domain of the arbitrator. *Aluminum Workers Int'l v. Consol. Aluminum Corp.*, 696 F.2d 437, 442 n. 2 (6th Cir.1982); *Lever Brothers, supra*, 554 F.2d at 120 (4th Cir. 1976).

4. Unlicensed Agreement, article V, section 16 and Licensed Agreement, article V, section 15 provide:

The Company shall not subcontract out work which is customarily performed by the Union unless either:

A. All employees of the Company who are available for employment are employed and the Company is unable to obtain men from the Hiring Hall or the Henry Lundeberg School of Steamship, or,

B. No boat of the Company is available for the performance of said work. In no case shall the Company subcontract out any work for more than one (1) year.

5. Unlicensed Agreement, article 1, section 1 provides in part:

The Company recognizes the Union as the exclusive bargaining representative of all vessel crew personnel and shorebased tankermen
. . .

Licensed Agreement, article 1, section 1 provides in part:

The Company recognizes the Union as the exclusive bargaining representative for all Captains, Relief Captains, Pilots/Mates and Engineers employed on tugboats, dredges, and/or barges owned or operated by the Company . . .

6. Unlicensed Agreement, article II, paragraph A. Licensed Agreement, article II, paragraph A.

relations under the agreement then the arbitration clause would presumptively require that National Marine submit the grievance to arbitration. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

■ The union's grievances, however, challenge conduct of National Marine which effected the union only after the expiration of the collective bargaining agreement. The agreement expired on October 8, 1985.[7] Through that date, National Marine owned the tugs and employed only union members on them. At no time during the life of the agreement did National Marine layoff union members or employ nonunion labor.[8] Not until October 9, 1985 did National Marine sell the tugs and layoff union members. If National Marine violated the union's rights under the collective bargaining agreement by subcontracting out work to Compass, that violation did not occur before October 9th when Compass employees first displaced union members on the tugs.

**B. The Effect of the Expiration of the Collective Bargaining Agreement**

The expiration of the collective bargaining agreement on October 8th profoundly changed the relations of the parties. Before October 8th, National Marine was obligated under the agreement not to subcontract. After October 8th, the agreement had expired and it is elementary that after the expiration of the agreement, the parties were no longer bound to its terms by operation of the agreement.

■ The parties, however, were still bound by operation of law to some of the terms of the agreement even after its expiration. The parties could not unilaterally change the "terms and conditions of employment" until they fulfilled their duty to bargain in good faith over those terms and conditions. *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); 29 U.S.C. § 158(d).[9] The terms and conditions of employment which are mandatory subjects of bargaining and which neither party could unilaterally change before fulfilling its obligation to bargain include the clause on the subcontracting of bargaining unit work. *Fibreboard Paper Products Corp. v. N.L.R.B.*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Therefore, even after October 8th, National Marine was obligated not to subcontract, but the obligation was imposed not by the agreement but by operation of law.

If National Marine subcontracted bargaining unit work after the expiration of the agreement without first fulfilling its duty to bargain, then it breached its duty to bargain in good faith.[10] That breach would constitute an "unfair labor practice." 29 U.S.C. §§ 158(a)(5), (b)(3). The National Labor Relations Board ("NLRB") has jurisdiction over claims of unfair labor practices. 29 U.S.C. § 160.[11] The NLRB is empowered to prevent and remedy those prac-

---

**7.** The collective bargaining agreement between the SIU and National Marine, by its terms, was effective from October 9, 1982 through October 8, 1985. Both parties gave written notice 60 days prior to the expiration date of their intention to terminate the agreement as required by section 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d).

**8.** During the life of the collective bargaining agreement, National Marine prepared to sell the tugs and layoff union members upon the expiration of the agreement. The agreement, however, does not prohibit this conduct.

**9.** If a party bargains in good faith until an impasse is reached, then the party is free to implement unilateral changes so long as the changes were offered to the other side during bargaining. *Huck Manufacturing Co. v. N.L.R.B.*, 693 F.2d 1176, 1186 (5th Cir.1982)

**10.** National Marine denies that its arrangement with Compass was a subcontracting of bargaining work over which it had a duty to bargain. It argues that it sold the tugs to Compass. It further argues that the sale was an exercise of its entrepreneurial right to sell its assets and close part of its business over which it has no duty to bargain. *First National Maintenance Corp. v. N.L.R.B.*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981); *Otis Elevator*, 269 NLRB No. 162 (1984).

**11.** NLRB decisions are appealed directly to the Court of Appeals. 29 U.S.C. § 160(f).

tices. If injunctive relief is appropriate, the NLRB is authorized to petition the district courts for such relief. 29 U.S.C. § 160(j).

■ That breach, however, would not constitute a breach or violation of the collective bargaining agreement because the agreement had expired. On October 9th, the parties' legal rights and obligations were no longer governed by the agreement. They were governed by the National Labor Relations Act ("NLRA") which operated to maintain the status quo terms and conditions of employment established in the agreement while the parties bargained over a new agreement. Because the union's grievances challenge conduct by National Marine which affected the union's rights after October 9th, these grievances are not related to the union's rights under the agreement, but rather are related to the union's rights under the NLRA. The union's grievances, therefore, are not arbitrable under the arbitration clause. The union's proper forum is not this court or an arbitrator but the NLRB.

The union, nevertheless, advances two arguments in support of its position that its grievances are arbitrable under the arbitration clause of the collective bargaining agreement. First, the union argues that the arbitration clause is a term and condition of employment which continues in effect by operation of law after the expiration of the agreement just as the subcontracting clause of the agreement continues in effect. The union argues that even after October 8th, the parties were still bound to arbitrate all grievances related to their post-expiration relations even though those relations were governed by the NLRA and not the agreement. Second, the union argues that its grievances are related to rights which, although deriving their force from the NLRA, were initially established in the agreement and derive their meaning from the interpretation of the agreement. This second argument is more limited than the first. The second argument is that the parties obligation to arbitrate grievances related to their post-expiration relations only encompasses those grievances related to rights established under the expired agreement itself—e.g., the union's rights under the no subcontracting clause.

## C. The Function of Arbitration

The union's argument that the arbitration clause continues in effect by operation of law after the expiration of the collective bargaining agreement must be rejected because it is contrary to a basic understanding of the function of arbitration in labor relations.

The national labor policy is to promote industrial peace by fostering the development by employers and their employees of a system of self-government mutually consented to through the collective bargaining process. *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 578–80, 80 S.Ct. at 1350–52. Labor arbitration is at the heart of industrial self-governance. *Id.* at 581, 80 S.Ct. at 1352. Arbitration is the parties' mutually agreed upon method of privately resolving disputes over the meaning of their collective bargaining agreement, the charter of their government.

Consequently, national labor policy strongly favors the arbitration of labor disputes. *See, e.g.,* 29 U.S.C. § 173(d).[12] There is a strong presumption that all disputes arising over the application or interpretation of a collective bargaining agreement are arbitrable. *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53.[13]

---

**12.** 29 U.S.C. § 173(d) provides in part:

Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement . . .

**13.** "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582–583, 80 S.Ct. at 1353.

The presumption of arbitrability even applies to suits for injunctions in aid of arbitration. *Gateway Coal Co., supra,* 414 U.S. at 377–78, 94 S.Ct. at 636–37. Indeed, the obvious rationale for granting such injunctions is to force the parties to arbitrate. *Boys Markets, supra.*

■ Arbitration is, however, favored because, and only because, it is the method of dispute resolution to which the parties have mutually consented through collective bargaining. It would be contrary to the concept of self-government to force the parties to resolve their disputes by a method to which they had not agreed. Consequently, any duty to arbitrate is purely contractual. A party cannot be compelled to arbitrate any grievance in the absence of a contractual obligation to do so. *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers,* 430 U.S. 243, 250, 97 S.Ct. 1067, 1071, 51 L.Ed.2d 300 (1977). There is no statutory duty to arbitrate. *Gateway Coal Co., supra,* 414 U.S. at 374, 94 S.Ct. at 635.

Indeed, arbitration is a creature of contract with no life independent of its collective bargaining agreement. *United Steelworkers v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582, 80 S.Ct. at 1352. It has meaning only within the contractual relationship arising from the agreement. *Nolde Brothers, supra,* 430 U.S. at 250, 97 S.Ct. at 1071.[14] Once the contractual relationship expires, the parties' duty to arbitrate the meaning of that relationship also expires. *N.L.R.B. v. Haberman Construction Co.,* 618 F.2d 288, 302 n. 16 (5th Cir.1980) (dictum), *rev'd on other grounds,* 641 F.2d 351 (5th Cir.1981) (en banc).

■ The union's argument that the arbitration clause continues in effect by operation of law after the expiration of the agreement would effectively force the parties to resolve their disputes by arbitration for a longer period than that to which they had agreed. The union's position is thus contrary to existing national labor law and policy. In addition, the arbitrator would no longer be determining the parties' rights under the agreement because it would have expired. The arbitrator would have to determine the parties' rights under the NLRA, a function he is not competent to perform.

Furthermore, the union's argument is contrary to the very rationale of the injunction in aid of arbitration which it seeks. The union argues that although the arbitration clause continues in effect after the expiration of the agreement, the no strike clause does not.[15] The union thus argues that on October 9th it could have gone out on strike over its grievance but that because it chose not to strike, National Marine is bound by the arbitration clause to arbitrate. The union argues in effect that it is not bound by the arbitration clause to submit its grievances to arbitration and that, if it should choose to strike, this court could not enjoin the strike and compel it to arbitrate. The union seeks to have its cake and eat it too. It cannot.

The rationale for issuing injunctions in aid of arbitration is that in order to make arbitration an effective system of industrial self-governance, each party must be able to compel the other to honor the arbitration clause. In *Boys Markets, supra,* the Supreme Court reasoned that an employer must be able to enjoin a union from striking over an arbitrable grievance and in violation of a no strike clause, otherwise, no employer would agree to be bound by an arbitration clause. The Supreme Court noted that a no strike clause is generally

Furthermore, arbitrator's decisions are subject to very limited judicial review. *United Steelworker v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**14.** Consequently, an arbitrator's decision must "draw its essence" from the contract. *United Steelworkers v. Enterprise & Wheel Car Corp., supra.*

**15.** Unlicensed Agreement, article V, section 1 and Licensed Agreement, article V, section 1 provide:

There shall be no strike, lockout, or stoppage of work while the provisions of this Agreement are in effect, except as otherwise provided in this Agreement.

considered the *quid pro quo* for the employer's acceptance of an arbitration clause. *Id.,* 398 U.S. at 248, 90 S.Ct. at 1591; *Cf. Teamsters Local 174 v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). When courts extended the rationale of *Boys Markets, supra,* to the issuance of injunctions against employers, their rationale was also to enforce the *quid pro quo. See, e.g., Lever Brothers Co. v. Int'l Chemical Workers Local 217, supra.*

There is no question that after the expiration of the agreement on October 8th, the union could have gone out on strike over its grievances. See *Kaufman & Broad Home Systems, Inc. v. Int'l Brotherhood of Firemen,* 607 F.2d 1104 (5th Cir.1979). Therefore, after the expiration of the agreement, National Marine was not bound to arbitrate the grievances.

Accordingly, I conclude that the arbitration clause of the agreement did not continue in effect by operation of law after the expiration of the agreement.

#### D. *Nolde Brothers* and its Progeny

The union's second argument relies on the Supreme Court decision in *Nolde Brothers, supra,* and decisions of other courts and the NLRB [16] which purport to follow it.

In *Nolde Brothers,* after the collective bargaining agreement expired and the employer closed its plant and the union members were laid off, the union made a demand for severance pay for its members pursuant to the wage provisions of the agreement. The union also demanded that the employer submit the question of severance pay to arbitration pursuant to a broad arbitration clause in the expired agreement.[17] The Supreme Court held that the employer was obligated to arbitrate the severance pay dispute under the expired agreement.

The decision in *Nolde Brothers* is simple and more a matter of common sense than legal reasoning. The union's grievance was arbitrable under the agreement because it involved the determination of the right to severance pay, a right arising from the agreement itself. The right to severance pay, unlike most rights under an agreement, does not expire with the agreement. In fact, it was the expiration of the agreement and the lay off of the employees that triggered the right to severance pay. Nevertheless, that right accrued under the agreement.[18] The most obvious examples of other rights that accrue under the agreement for which the parties have a post-expiration obligation to arbitrate are those rights actually in arbitration at the time of the expiration of the agreement. 430 U.S. at 251, 97 S.Ct. at 1071.

Despite its simple and narrow decision, *Nolde Brothers* has created a great deal of confusion over the scope of the obligation to arbitrate disputes arising from the parties' relations after the expiration of their agreement. See Geslewitz, *Case Law Development Since Nolde Brothers: When Must Post-Contract Disputes Be Arbitrated?,* 35 Labor L.J. 225 (1984). Some courts and the NLRB have read *Nolde Brothers* broadly to hold that there is a strong presumption that the parties intended their obligation to arbitrate to survive beyond the expiration of the agreement and that therefore there is a strong presumption that all post-expiration disputes arguably touching on the agreement are still subject to arbitration. *See, e.g., Local Joint Executive Board of Las Vegas, Culinary Workers Union v. Royal Center, Inc.,* 754 F.2d 835 (9th Cir.1985); *Federated Metals Corp. v. United Steelworkers,* 648 F.2d 856

---

**16.** The decisions of the NLRB are persuasive authority which this court must consider. *Carpenters Local Union No. 1846 v. Pratt-Farnsworth,* 690 F.2d 489 (5th Cir.1982).

**17.** The arbitration clause simply applied to "all grievances". 430 U.S. at 245 n. 1, 97 S.Ct. at 1068 n. 1.

**18.** The Fourth Circuit opinion is instructive on this point. *Local No. 358, Bakery & Confectionery Workers Union v. Nolde Brothers, Inc.,* 530 F.2d 548 (4th Cir.1975).

(3rd Cir.1981); *Natsnax, Inc. v. Bakery Drivers Local 194*, No. 84–1317, slip op. (D.N.J. April 1, 1985); *Digmor Equipment & Engineering Co. Inc.*, 261 NLRB 1175 (1982); *American Sink Top & Cabinet Co., Inc.*, 242 NLRB 408 (1979).

To the extent these decisions compel, under a broad arbitration clause like that in *Nolde Brothers*, arbitration of disputes over contractual rights which accrued or vested during the agreement, they follow *Nolde Brothers*. To the extent these decisions compel, under a broad arbitration clause, arbitration of disputes over rights which are not contractual and which did not accrue or vest during the contract, I find their reasoning unpersuasive and choose not to follow them.

The only relevant authority in this circuit on *Nolde Brothers* is inconclusive. In *Boilermakers Local 582 v. Delta Southern Co.*, 602 F.Supp. 625 (M.D.La.1985), *aff'd*, 782 F.2d 1038 (5th Cir.1986), the district court, relying on *Nolde Brothers*, held that a union's grievance brought after the expiration of its contract was arbitrable because it involved the determination of whether the employers' alleged payment of severance pay only to nonunion employees violated the antidiscrimination clause of the contract.[19] Because the court did not address when the discrimination allegedly occurred, its reading of *Nolde Brothers* is unclear.[20] The Fifth Circuit affirmed in an unpublished opinion, simply stating that it was in essential agreement with the district court.

■ I, therefore, approach the interpretation of *Nolde Brothers* as a question of first impression in this circuit. As I have explained, I read the decision narrowly. Accordingly, I reject the union's second argument. The arbitration clause at issue in this case only requires arbitration of the

parties' contractual rights under the terms of the agreement and the parties' relations during the life of the contract. It does not require the parties to arbitrate their rights and relations which arise outside the contract and after its expiration.

## IV. CONCLUSION

The SIU's grievances do not involve contractual rights under the collective bargaining agreement but rather they involve statutory rights under the NLRA. Even though it lodged its grievances during the life of the agreement, the grievances do not involve the parties' rights or relations under the agreement. As previously stated the grievances cannot make a claim that they dispute any contractual right because they challenge conduct by National Marine which occurred after the expiration of the contract. The grievances dispute whether National Marine's conduct in selling the tugs and laying off union members after the expiration of the agreement constituted an unfair labor practice by affecting a unilateral change in the terms and conditions of employment without bargaining to impasse. The proper forum for the union to vindicate this statutory right is the NLRB. This court has no jurisdiction to grant the relief it seeks. Accordingly,

IT IS ORDERED that the plaintiff's request for preliminary injunction is DENIED.

IT IS FURTHER ORDERED that the complaint is DISMISSED.

---

**19.** The contract made no provision for severance pay so union members were only entitled to it if and when it was paid to nonunion employees.

**20.** For example, if the union alleged that the employer paid the nonunion employees severance pay during the life of the contract, then the

grievances were over contractual rights which clearly accured during the contract and the district court's decision is consistent with *Nolde Brothers*. This is, of course, not the only way that the district court's decision can be consistent with *Nolde Brothers*.